Good morning, ladies and gentlemen. Our first case for argument this morning is Friedman v. Highland Park. Mr. Boyce. Good morning. James Boats on behalf of the plaintiffs. We're here this morning on appeal from the district court's order granting summary judgment in favor of Highland Park and finding that the Highland Park assault weapons ordinance is constitutional under the Second Amendment. The Supreme Court made it clear in Heller and again in McDonald that law-abiding persons have a core constitutional right to keep commonly-possessed firearms in their homes to defend themselves and their families. That core constitutional right, when it's exercised by law-abiding persons, cannot be diminished by the government. Any law that does so, any law that tells law-abiding persons how they may defend their homes, what type of commonly-owned firearms they may possess for that purpose, is categorically unconstitutional under the Second Amendment. So if somebody decides to possess a bazooka for personal protection, the Second Amendment disables the state from regulating it? You can see where this is going. The next question will be an old M-41 tank. Well, I'll answer your first question and then your second question. I think that possession of a bazooka in the home is already prohibited under federal law, but more importantly... Well, that might be banned, in your view, by the Second Amendment. More importantly, it falls into that category of long-standing prohibitions recognized by the court... There's no long-standing prohibition of bazookas. They weren't invented until relatively recently. Well, it's a long-standing prohibition on the civilian ownership of bazookas. I'm sure dating back to the moment they were invented, there was a long-standing prohibition on their ownership, much like short-barreled shotguns in the United States v. Miller. Are you sure of that? Pardon me? Are you sure that there was a prohibition on private ownership of bazookas dating back to their invention? I can't be entirely positive of that. It was perfectly legal in the United States, in many states, to own fully automatic rifles, the Thompson submachine gun, which Chicago made famous. On your view, a fully automatic rifle, a Tommy gun, would be covered by the Second Amendment, would it not? No, it would not. Why not? Because the prohibition on ownership of those firearms dates back to the 1930s, nearly 80 years ago. Yes, and the Second Amendment dates back to the 18th century. Why would a prohibition adopted in the 1930s override the Second Amendment, any more than a prohibition adopted in the 2010s? Well, as your Honor knows, Heller does not speak to all laws and all prohibitions on ownership and possession of firearms. It leaves a lot of questions unanswered. Yes, that's part of the problem. Heller says we'll sustain reasonable prohibitions and not unreasonable ones, leaving us with the question, what's reasonable? But I don't see how you can say, well, fully automatics are different from semi-automatics because they were prohibited in some states, say in the 1950s, when the 1950s are 150 years after the Constitutional Amendment. And I don't see how we could have a distinction saying statutes adopted 150 years after the Second Amendment are okay, but statutes adopted 200 years after the Second Amendment are forbidden. That doesn't sound like a rational distinction, does it? Well, it may not be a rational distinction, Your Honor, but we're here today to discuss a ban on semi-automatic firearms, not fully automatic firearms. But the structure of your argument is one under which fully automatic firearms are as protected by the Second Amendment as semi-automatic firearms. I don't believe that's the case, Your Honor, because I don't believe that the case could be made that fully automatic firearms are commonly possessed by law-abiding persons. They are commonly possessed these days because they're illegal. But before they were made illegal, they were quite commonly possessed. Well, I don't know that there's evidence to that effect dating back to the 1930s and the 1920s and the 1910s. But the simple fact of the matter is the firearms at issue in this case are without question commonly owned by law-abiding purposes. The evidence in the record is clear that these firearms are among the most popular rifles owned by American citizens today. In 1994, the United States Supreme Court in Staples recognized AR-15 rifles as traditionally accepted as lawful possessions. A generation later, one out of every nine firearms manufactured and sold in this country was an AR-type rifle, just one of the many types of rifles banned by Highland Park under this ordinance. I want to get back to the automatic machine guns that my brother mentioned. Do you agree that a city can ban automatic machine guns without violating the Second Amendment? I do agree that they could. In fact, it would be entirely consistent with federal law, subject to some exceptions under federal law, that does permit some civilians under restrictions to possess those firearms. Well, what if the machine guns became popular and lawful in some places? Would banning them then become unconstitutional because their use would become common? I think that under the decisional framework of Heller, that law or possession of those firearms would be viewed as one of those long-standing prohibitions prohibiting firearms that are not commonly owned and possessed that are dangerous and unusual. Well, the weapons that are at issue here are not quintessential self-defense weapons, and you didn't point the district court to any instances of an assault weapons use in self-defense, did you? No, there was no anecdotal evidence in this record to that. Well, doesn't that matter when your argument is that you need these weapons for self-defense? I don't believe it does, Your Honor. I don't believe that anecdotal evidence of somebody using one of these firearms for self-defense purposes or anecdotal evidence of a criminal using one of these firearms for unlawful purposes is the kind of evidence that should drive constitutional policy. You know, it certainly might have made the record more interesting. It would have been something to talk about. But the simple fact of the matter is there is substantial evidence in this record substantiating the use of these firearms for self-defense purposes. Well, let me get more specific. Are there any known instances where a person needed to fire 10 or more rounds in self-defense? Certainly there are, Your Honor, and, you know, there's not that anecdotal evidence, but there is data in the record indicating that as many as one out of every eight New York police shootings involved firing more than 10 rounds of ammunition. And keep in mind, those are police officers who are arguably more trained than many civilians are trained, and they had the obligation or the need to fire more than 10 rounds. But I think more importantly, you may or may not need to fire any ammunition in a self-defense encounter. Merely brandishing a gun might be enough to end the threat. So is it your position that people can carry around AK-47s and other assault weapons in public around downtown Highland Park or Chicago or Indianapolis when they say they need to for self-defense? No, we're discussing here possession of these types of firearms in the home to protect yourself and your family. We're not talking about carrying these firearms outside of the home in public places. What we're arguing is that the City of Highland Park does not have the right under Heller to tell law-abiding citizens like Dr. Friedman that he cannot possess this type of firearm in his home for self-defense purposes. And the reason is that under Heller, commonly owned firearms are protected under the Second Amendment categorically. Now, Your Honor, let me stop you there for a minute. How does the ordinance meaningfully limit Highland Park residents' ability to defend themselves? They can still have other types of firearms, can't they? Yes, they can, but Heller expressly rejected that argument. It held that it is no answer for the government to say that it's okay to ban handguns as long as other types of guns are available, i.e., long guns. Well, let me take that a little further. The ban might remove a class of weapons that the plaintiff would like to use, but is there any evidence that his Second Amendment rights would really be affected? In other words, you haven't pointed to any studies that assault weapons are somehow better than handguns for self-defense, right? Well, Your Honor, I think we have. We have cited to substantial evidence in the record from experts and others that these types of guns are believed by many to be the most suitable type of firearm for self-defense encounters. They are the firearms that have been adopted by governmental agencies expressly for that purpose. They are accurate. They are reliable. They are easy to use. They have minimal recoil compared to other firearms. These are essentially the modern technological evolution of firearms. They have many, many attributes that make them suitable for self-defense purposes, including the fact that they are arguably the safest kind of self-defense gun to use in the home, and that's because most of these firearms are typically chambered for .223 ammunition, which is a relatively lightweight round of ammunition that has sufficient stopping power to end that threat, and that is ultimately the goal in any frightening self-defense encounter. But because they're lightweight, when they hit an interior wall, they lose momentum more rapidly than large caliber rounds do, and they pose less of a threat to an innocent family member on the other side of that wall than large caliber ammunition or heavy buckshot from a shotgun. Your argument is pretty much focused on the right to keep. Correct. I assume, because there's a distinction between the right to keep and to bear arms, and to bear arms, you've stated earlier, it's not really your position to be able to carry these larger things around with them. It's mostly what you can keep in the home. That's correct. And I assume Dr. Friedman, who owns the gun, has the capacity to use this. I don't know what's in the record as far as his testimony, but I assume he uses these weapons for certain things. Either he hunts or he target practices, or maybe he just has it there because he knows how to use it and it's in his home. What is the fact that's in the record? Well, the record evidence regarding Dr. Friedman's possession of this firearm is that he keeps it in his home for self-defense purposes. That's the extent of the record regarding Dr. Friedman's. But does he have training in it? Is there something that he knows how to use that other people don't? There is nothing in the record to that effect. I can speak outside the record, but I don't know that the court is interested in that. In the appendix, it has the statistics in Chicago where almost all of the murders, about a little more than one a day in Chicago, are by pistols. Is this something that is better for defending against common use? I'm not saying that's the case in Highland Park. I guess maybe the bad guys don't go there or something. But whatever, is that defense more effective against a pistol, which is more commonly used in murder? Well, every circumstance is obviously different, and any gun can be effectively used in any circumstance. These guns, these semi-automatic rifles that Highland Park has chosen to ban, are accurate, they are reliable, they have less recoil than many other guns. So in any hypothetical self-defense counter, a person would be well-equipped to defend himself with one of these guns. And so are you saying that they're appropriate for use in confined spaces like a hallway or a bedroom? Absolutely. In fact, they're put in the hands of Homeland Security agents as personal defense weapons for that very purpose, for use in close-quarter situations. Wouldn't responsible gun orders lock and store the firearms, which would make them less accessible in an emergency than a handgun? Well, there's lockable safes for all types and sizes of firearms. The notion that you can only safely store a small gun is simply not an accurate notion. And specifically in terms of Highland Park, since 2003, there's only been one murder, only two home burglaries, in the last five years where a resident was present. Isn't that right? Well, that is the record evidence. However, the right guaranteed under the Second Amendment, in fact all of the rights guaranteed under the Bill of Rights, are national rights. There's no geographic by geographic restriction or limitation on the Bill of Rights guarantees. And Justice Alito recognized that fact in the McDonald case in which he stated that the Bill of Rights are guarantees from the national perspective. They limit local governments' ability to devise solutions to social problems that suit the needs and values of those local communities. So the idea that one community can limit somebody's constitutional rights that he may have in another community just isn't, I don't think, good constitutional policy. But coming back to your point, Judge Williams, on whether there's any evidence that any of these guns have been actually used in a self-defense encounter, I think it's important to recognize that fundamental constitutional rights exist even if they're not exercised. And here we're talking about the right to keep a commonly owned firearm in your home. That right exists whether it's never taken out of a safe, a closet, a bedside drawer. And Heller says that governments cannot tell law-abiding people what kind of guns they can own in their home provided that gun is commonly owned by law-abiding people for lawful purposes. Does commonly owned mean it's not dangerous and unusual? I don't believe so, Your Honor, because in Heller, the test the court established is, are these firearms commonly owned for lawful purposes? And they only relied or cited to the dangerous and unusual phrase as support for that common use standard. A gun cannot be common and unusual at the same time. There aren't two separate standards that we have to meet here. And the standard that the court ultimately came down to was common use at the time. And I see I'm in my rebuttal time, and I'd like to sit down and yield the podium to my opponent. Certainly, Counsel. Mr. Wilson. Good morning, Your Honors, and may it please the court, my name is Chris Wilson. I'm counsel for the city of Highland Park. This court should affirm the district court's decision granting summary judgment in favor of Highland Park and affirming the assault weapons ban for two reasons. One, the ordinance at issue does not implicate the Second Amendment under Heller. That surely is ridiculous. It implicates the Second Amendment. You must mean it's valid under the Second Amendment. This is a firearm. This is a suit about firearms. It has nothing to do with anything except the Second Amendment. If I could, Your Honor, it takes me a minute to explain why I take that position. But first is to start where Mr. Vogt's left off with Heller, which says in Heller, like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th century cases, commentators in courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. That's straight from Heller. Thus, while Heller held that the Second Amendment established a right to a handgun for self-defense in the home, it did not expand beyond that right to all weapons. That's the problem. Heller and McDonald are two instances, and now we need to figure out what else, if anything, the Second Amendment covers. That's a far cry from saying it doesn't implicate the Second Amendment. So let's go to what the Supreme Court said. The Supreme Court said that commonly owned weapons are covered, and the claim in this case, as I understand it, is that this category of semi-automatic weapons is commonly owned and, therefore, within the scope of the Supreme Court's rule in Heller and McDonald. Now, what's wrong with that? Well, that's certainly the contention of the plaintiffs. All right. So are you denying that that is the rule, or are you denying that this category of weapons is commonly owned? We don't know if there is a record. The lower court below determined that he couldn't determine that this was commonly owned and moved on to the second prong of the analysis. Well, if the district court doesn't know whether these weapons are commonly owned or not, then you can't grant summary judgment, unless, in your view, that's not the legal standard at all. Correct. The legal standard is, first, let's look at these weapons and determine, one, are they commonly owned, or, two, are they dangerous and unusual, as that phrase is understood generally. Well, if they're commonly owned, they're by definition not unusual. Correct. So do you read dangerous and unusual, or dangerous for unusual? Well, the Supreme Court took that phrase from Blackstone, and Judge Posner of this court has referred to it. And in Blackstone, in his commentaries, he referred to weapons that were dangerous and unusual as those that were used to terrorize the populace. It's a term of art for weapons like the bazookas you referenced that would not be accepted by a civilized society. And the city of Highland Park has determined that assault weapons, given their horrific use in mass shootings and the fact that they are used more often than other weapons on a proportionate basis for the assassination of law enforcement officers, that those just aren't the kinds of weapons that they want in the city of Highland Park. They're too dangerous. So what is your measure for whether a firearm is in common use under Heller? What is your measure? Heller really hasn't defined that, but what we know is that Heller set the far bar as handguns. Those are the quintessential weapon for self-defense. Where along the scale the denominator is so large and the number is so small that they're not in common use, we don't know. We know that a number of these guns have been manufactured, but we don't know how many have been sold. The weapons manufacturers do not release sales data. But we don't know whether two, three million is common given 150 million guns or not. And the district court said I can't make that decision, I can't reach a determination, and therefore I'm moving to the second prong of the analysis, which is the intermediate scrutiny. But I would submit that it's reasonable for this court to determine assault weapons and large capacity magazines are not the type of weapons that are guaranteed protection under the Second Amendment by Heller. Is there a difference of who is the bearer? There's examples in your brief of these horrendous crimes. Holmes is now looking for a jury. Adam, what's his name at Sandy Hook, took his mother's legal gun and went into a school. And it seems that all of these horrific things are not so much based on what weapon they used, but who used it and why they used it. Because certainly Dr. Friedman is not a terrorist or anyone else. He's a citizen who lives there and who owns a gun. And he thinks that's the best protection for him in his home, in his family. Does it matter who's the bearer? Is that too subjective? No, it does matter who's the bearer, but it also matters what the weapon is, Your Honor. And the problem is when these weapons, assault weapons with large capacity magazines, are used by the wrong people, the carnage that results is just horrific. In Chicago, almost all of the murders, based on the statistics here that pointed it out, of the hundreds a year, it usually averages, it seems then, shockingly, about one a day, almost all of those are pistols. But nevertheless, they're not outlawed. The main murder weapon is not outlawed. And that's what concerns me here, that this much narrower group is outlawed just because of what it looks like, I guess. And, Your Honor, there is an absolute Second Amendment right to a handgun. And this court has extended the right to that handgun to also carry that handgun outside of the home, to bear the arm. Well, there are a whole lot of long rifles and shotguns and everything else that are much bigger than a handgun that are also covered. Well, not by Heller. It may be extended by other case law. But the question that you posed is exactly the right one, which is that the problem that happened in Sandy Hook, where Mr. Lanza took his mom's legally owned gun, took it to a school, and fired it 130 times in eight minutes, and killed 20 students, and then killed himself, that could not happen under this ordinance because no one in Highland Park could legally own that assault weapon. And therefore, no one could steal it from his mother's home and take it to a school and shoot somebody. Of course it could happen in Highland Park when someone comes from the neighboring community where they're not banned and comes in with one, which is what has really happened in these other categories. But Highland Park is limited to controlling, as a government, what it can. And it looked at Sandy Hook and said, we want to make sure that no one can do that in Highland Park. And to the question of handguns versus assault weapons, there is a significant difference in what can happen. In Tucson, Arizona, there was a large capacity magazine and a semi-automatic handgun. The shooter was able to get off 31 shots before they could tackle him. That's what this is designed to thwart, which is the multiple injuries. Since 2007, there have been 15 incidents where eight or more people were killed or wounded using assault weapons and large capacity magazines. It's a significant problem. Handguns are protected by the Second Amendment. Assault weapons are not. Let me ask you this. A lot of handguns are semi-automatic. Could the city ban all semi-automatic handguns? No, they could not. What they're limited to is the assault weapons ban and the large capacity magazines. But handguns, certainly under Heller, are protected. You've argued that because a person can use other firearms like handguns, the ban here really doesn't remove a person's ability to exercise their Second Amendment rights. But is that the right inquiry under Heller, especially when it has language that says it's no answer to say that it is permissible to ban the possession of handguns so long as possession of other firearms is allowed? Correct. Let me take you to the beginning of that in Heller because I think that's an important point. Heller says at page 629, the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense. It is easier to store in a location that is readily accessible in an emergency. It cannot easily be redirected or wrestled away by an attacker. It is easier to use for those without the upper-body strength to lift and aim a long gun. It can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid. So everything in Heller looked from the handgun to everything else and said the handgun is simply too historic, too popular, too reasonable a weapon, too popularly accepted a weapon to ban, and therefore an outright ban is invalid under the Second Amendment. They did not reverse it and say, and therefore, as Mr. Vose would have you believe, any weapon ban is invalid. The reverse is the case, which is Heller, as Judge Easterbrook pointed out, left that open and forced the courts to determine where do we draw that line? And the first place you would look is are they commonly owned? Judge Easterbrook, I accept your response to that, which is that you view these as commonly owned. The district court could not reach a determination. That is the beginning of the analysis, not the end. Then we move to the second prong, which asks, is there a close fit between the ordinance and the public interest that it's attempting to address? And here I submit Highland Park met that close fit. The district court certainly found that Highland Park did so. They found that the public interest was in eliminating this narrow band of weapons in order to eliminate the horrific mass shooting events, Your Honor, that have occurred in Sandy Hook, in Tucson, in Santa Monica, in Aurora, Colorado. In Aurora, Colorado, someone armed with a drum of 100 bullets entered a movie theater and killed 12 people and injured 58 more in a matter of minutes. That is what the Highland Park... He had a lot of other guns. He did have... And the one that shot the congresswoman, I think that was a pistol with a lot of capacity. Correct. A pistol nevertheless. Correct. And let me take each of those. The large capacity magazine, it was a 30-magazine clip. Banana clip, sure. It holds a lot of bullets, and it's intimidating, and that's where I distinguish a bearer versus the keeper. Correct. But in Highland Park, they attempted to address that by limiting the capacity of a magazine to 10 bullets, and so that in Tucson, if that were to happen at the Rabinia Festival or happen at the Highland Park High School, after 10 horrible shots, they could tackle the person, as they did in Tucson, rather than waiting for an additional 21 shots. You have to put two clips in or something. But nevertheless, I'm not... It's all a horror show. It is awful, and there's no question about it. And I think Highland Park has distinguished itself from everywhere else in Illinois. What about Chicago? What's the limit there? Well, Cook County has also adopted a ban nearly identical to the one adopted by Highland Park. Has that been challenged at all? That is, that is. And there will be a trial on that issue in the circuit court. So this is the headline, I guess, of the first one. Because the concern for me is that I think it's completely feasible that someone... And these guns have all evolved. Obviously, we don't go back to day one. But these guns have evolved into they're more efficient, they're safer, they're more accurate. They have different nomenclatures that enables lesser people, people that haven't been trained in combat and other things. When I was in Vietnam, I carried a gun, and I never had to use it. And it was obsolete. It was an M14. Everybody else got an M60. I wasn't in combat. I just tooled around with it. But I know the difference. And it seems if somebody has that kind of a weapon and they're comfortable with it in their home and think this is the best way to do efficiently, if someone comes in from outside of Highland Park with the kind of weapon you're against, maybe the best defense is one like it. But, Your Honor, I think that proves too much, in that if someone said the best weapon for my home would be an M16, I know how to use it, I was trained in the military, that's the best weapon for me. That is clearly outside of Heller. There is no Second Amendment protection for an M16 in your home. Or to Judge Easterbrook's example of a bazooka. You could not have a bazooka. I don't know why not. Well, for two reasons. They're not commonly owned. They're dangerous and unusual. But that's entirely circular. The reason they're not commonly owned is that they're illegal under federal law. All machine guns are illegal under federal law. I don't see how you can use the effects of a law to override the Second Amendment. It would be like saying handguns in the home, in the District of Columbia, were not common. And the reason they weren't common is that they were illegal. And, Your Honor, I understand the argument. Heller has provided that framework for us, and that's been used by the courts. First, look, does it implicate the Second Amendment? And second, if it implicates the Second Amendment... The problem is that if that framework had been applied in Heller itself, the law would have been sustained because handguns were not common in the District of Columbia, having been made illegal. Although they've noted that the proper scope for determining common use is not locality by locality. Because we would submit they are not common, the assault weapons are not common in Highland Park, but the proper reference point is nationwide. So you're right. Heller did not present handguns in the District of Columbia, but they were common nationally. Assault weapons are not yet that common. There have been great sales according to, or manufactured recently, since the lifting of the federal ban and, frankly, since the election of President Obama. But other than that, they are not the kind of weapon that have been used across the country. Like handguns, or even like rifles, or shotguns. They are a very, very narrow sliver of weapons that for whatever reason, and Judge Manion, this gets back to your question, for whatever reason, in Tucson, in Aurora, in Sandy Hook, it was the assault weapon which was the choice of the mass murderer, not the other weapons. Yeah, he was crazy. That's what really irritates me, is that these extreme examples, Holmes is saying he was insane. We don't know what Adam's problem was, because he's dead. And this is the frustrating thing, just in looking at it, is that someone who has a legal gun everywhere else and can purchase it over the counter, and he understands the gun, and chooses that as his protection. Apparently he doesn't do stuff outside the home, if that's what's in the record. He's not a target shooter. He's not a deer hunter. He has it for that purpose. If I could address your concern this way, though. The city of Highland Park presented former agents of the Bureau of Alcohol and Tobacco and Firearms, who presented affidavits that these were not good weapons for self-defense. They're unwieldy. They're difficult to secure. If you are a really safe homeowner, you don't have the ammunition with the gun at the same time. They're easy to pull away from someone who's not experienced. The idea, and to Judge Williams' point earlier, these have never been used in any event of self-defense that anyone can identify. Mr. Boats referred to that as anecdotal. We don't even have an anecdotal evidence. We don't have an anecdote. These have not been used for self-defense in Highland Park or anywhere in the country that anyone can identify. They are not the handgun. They are not the rifle or the shotgun that people have traditionally used in their homes for self-defense. It may be that some people would like to use them for self-defense, but that shouldn't overwhelm the public interest that Highland Park has presented, which is these are very dangerous. They're used in the wrong hands to kill too many people. What's dangerous about being in somebody else's home? You can finish with him now because I'm going to interrupt. I'm sorry. What's dangerous about being in someone else's home? They're not in your own home. These are not typically used or properly used for self-defense. The dozens and hundreds of other weapons that are available are much better for self-defense, and that's the evidence we presented below. This is what he has in his home. This is where I distinguish it. He's not plugging it around and showing it off and whatever maybe some people do in some states, I don't know. But in this particular instance, he's chosen this to protect his own home, and he's not out banishing it. But, Your Honor, the right of Heller, the right to a handgun, this court has extended that beyond the home. This court has said the right established in Heller, you have the right to carry that outside the home. That's Moore v. Madigan. So if you say you have a right to an assault weapon in your home, there's nothing under the precedence of this court limiting it to the home. Then you can take that to Target. You can take that to the fast food restaurant. You can take that to a car driving around with it. That's probably right. And unfortunately, people are doing that. But the city of Highland Park is not permitting that. And the characteristics of these weapons are critical, I think, to Highland Park when you look at the reasons for banning the various features. Isn't that right? So, for example, these thumbhole stocks, they allow a shooter to spray fire from a hip position, whereas normally a sports shooter would use the shoulder for precision. Yes. And the folding or telescoping stocks allow the shooter to make a large and powerful weapon more compact and more concealable. Or that protruding grip that controls the recoil and muzzle climb in order to increase accuracy across multiple successive shots. I mean, the various characteristics of these really show the danger of these weapons. If I could, Your Honor, and you're right. And the one that's most concerning to me is the barrel shroud, which the barrel shroud, the purpose of that is to allow you to hold the barrel and fire multiple shots without burning your hand. You don't need that for self-defense. The shooter in Aurora would have burned his hand if he had to hold a weapon without a barrel shroud and fire that many times. And then he can stabilize the barrel with his free hand when he's not being burned. Correct. I see that the light is on. Assault weapons bans such as Highland Park's currently have been enacted covering 25 years. Thank you, counsel. Thank you, Your Honor. Mr. Volk, anything further? I want to briefly address these five prohibited characteristics of the semi-automatic rifles that Highland Park has banned. Highland Park's own expert has conceded in this case that the presence of one of these features on one of these rifles does not make the rifle any more dangerous or less dangerous. And the reality is that these features on these rifles make the gun more accurate, make the gun more safe to use by law-abiding purposes. And it's, quite frankly, backward thinking to believe that design characteristics of a firearm that make it safer, more accurate, more reliable can be turned around and serve as a basis to deny law-abiding citizens to possess those guns in their home. I mean, this is the technological evolution of firearms. And I know Heller is a difficult decision for lower courts to deal with. There's a lot of unanswered questions. But I do think that one thing has clearly emerged from this court's application of Heller, and that is that when the rights of law-abiding persons to protect themselves in their home is affected by a law, that right is entitled to full solicitude. It's not a right to be taken lightly. That's what this court has done with Heller in its prior Second Amendment cases. And I'd like to briefly address Sandy Hook because it's clear from the record that the Highland Park City Council, in principal part, passed this ordinance in reaction to the horrible events at Sandy Hook. But you need to look at Sandy Hook a little more closely than just that he went into that gun school with a rifle. He also went into that school with two fully loaded large caliber handguns, 11 fully loaded spare magazines for those handguns, and 191 rounds of large caliber handgun ammunition. If he did not have that rifle with him that day, unfortunately, he would have been very able to inflict the same number of casualties as he did with the rifle. So I think Highland Park is confusing correlation with causation here. And, in fact, as Judge Kavanaugh recognized from the D.C. Circuit in Heller 2. . . He was, of course, dissenting. He was dissenting, but he did. . . Has any court of appeals adopted the position you're espousing here? There's only one federal court of appeals who's even addressed the constitutional assault weapon ban, and that's the D.C. Circuit in Heller. And that's Heller? Yes. I understand there are quite a few decisions from district courts. Do you know whether they are pending on appeal? Yes. In fact, the Connecticut assault weapons ban and the New York State assault weapons ban is in the Second Circuit. It was argued in mid-December, and it's being considered by the Second Circuit as we speak. In those district court opinions in Connecticut and New York, however, those courts applied a level or a type of intermediate scrutiny that this court has not ventured toward in its Second Amendment cases, a type of scrutiny. . . To be blunt, we have absolutely no idea what scrutiny means here because the justices have said they're not announcing anything. They're reserving their right to figure this out in the future. That makes life very difficult for an intermediate appellate court. It's a quagmire. Do you have any speculation about why the justices have declined all opportunities to hear post-McDonnell cases? I don't know that they've had an opportunity to take any, quite frankly. They have had quite a few. Okay, well, I'm not aware of that. Including from this court and including Heller, too. And they've denied cert in every one of them. I have no insight into their decision-making process on that. But I see that I've run out of time, and unless the court has any further questions, thank you. Thank you very much. The case is taken under advisement.